UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENISE BONDS, *et al.*,

    Plaintiffs,

v.

COMPASS GROUP, *et al.*,

    Defendants.

_____/

Case No. 22-11491

F. Kay Behm
United States District Judge

# OPINION AND ORDER GRANTING MOTION TO DISMISS COUNTS I AND II (ECF No. 57)

## I.    PROCEDURAL HISTORY

Plaintiffs have brought an employment action against their former employer(s), Defendants Compass Group and Crothall (collectively "Crothall/Compass") as well as the DMC Defendants (Tenet Healthcare Corporation, VHS of Michigan, Inc., d/b/a Detroit Medical Center, and VHS Harper-Hutzel Hospital, Inc.) who contracted with Crothall/Compass to provide certain environmental and facility management services at the DMC hospitals. Plaintiffs filed their Third Amended Complaint (TAC) on June 6, 2023 (ECF No. 50) after the court granted in part Defendants' motions to strike portions of the Second Amended Complaint. (ECF No. 51). The DMC Defendants then filed a motion to dismiss Counts I and II of Plaintiff's TAC. (ECF No. 57). The

1

Crothall/Compass Defendants also filed a concurrence in the motion to dismiss these two counts of the complaint. (ECF No. 61). In Counts I and II of the TAC, Plaintiffs allege the DMC Defendants violated the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610c, ("Michigan FCA"), and the False Claims Act, 31 U.S.C. § 3730(h), ("FCA"). This matter is fully briefed. (ECF Nos. 59, 60). The court has determined, pursuant to Local Rule 7.1(f)(2) that this matter can be decided without a hearing.

For the reasons set forth below, the court **GRANTS** the motion to dismiss Counts I and II.

**II.    THIRD AMENDED COMPLAINT**

Defendant Tenet is a private corporation that is the parent company of hospitals throughout the country, including in the Metro-Detroit area. Defendant VHS of Michigan Inc., which does business as the DMC, operates hospitals in the Metro-Detroit area, including Defendant Harper-Hutzel. (ECF No. 50, ¶¶ 8-10, 15; ECF No. 56). Plaintiffs allege that they previously worked for Sodexo, which Tenet contracted to provide environmental services to DMC hospitals. *Id*. at ¶¶ 16-19. In September 2019, Tenet contracted with Crothall/Compass to take over the environmental service operations at the DMC, including at Harper-Hutzel. *Id*. at ¶¶ 11, 22-23. At that same time, Plaintiffs became full-time employees of

Crothall/Compass and were placed at Harper-Hutzel. *Id*. at ¶ 25. Plaintiffs allege that they were employees of Crothall/Compass and Crothall/Compass was their employer. *Id*. at ¶¶ 172, 212, and 223. While employed by Crothall/Compass, Plaintiffs were "housekeepers" and were also union stewards. *Id*. at ¶ 26. Plaintiffs' employment was terminated by Crothall/Compass in May 2022. *Id*. ¶ 25.

In the TAC, Plaintiffs compare the level and quality of the environmental services that Sodexo provided to the DMC hospital to those that were provided by Crothall/Compass, alleging that there was a decline in the quality of services provided to the DMC Hospitals when Crothall-Compass provided them. (ECF No. 50, ¶¶ 16-25, 40-44). Plaintiffs allege that Sodexo "never ran out of supplies and had enough cleaning supplies . . . and essentials to properly sanitize patient rooms and operating rooms, per established Sodexo protocols" (*id*. at ¶ 20), and Sodexo used "hospital grade cleaning products and separate rags and mops in order to avoid cross contamination" (*id*. at ¶ 21). Plaintiffs allege that since Crothall/Compass has been providing the environmental services for the DMC hospitals, the "cleaning protocols changed from best practices with Sodexo to deplorable with Crothall/Compass." *Id*. at ¶ 39. Plaintiffs allege that under Sodexo, they were provided approximately 50 rags to clean 28 rooms versus 5

rags to clean 28 rooms under Crothall/Compass (*id*. at ¶¶ 40-43), "[m]ops went from an unlimited supply to not enough to do the job properly" and "[c]leaning solutions that were 'hospital grade' were always out" (*id*. at ¶ 44). Plaintiffs also allege that Defendants failed to follow Covid-19 protocols and provide Plaintiffs with proper PPE. (ECF No. 50, ¶¶ 48-62).

Based on the alleged decline in the quality of environmental and sanitation services and the decrease in the quantity of cleaning supplies under Crothall/Compass, Plaintiffs allege they made numerous complaints to Defendants' leadership relating to sanitation at Harper-Hutzel. Bonds' email to Defendants' leadership and Plaintiffs' union stewardship states that 12 to 15 employees in the EVS department have contracted Covid-19, cites the use of rags to mop floors and a consistent lack of cleaning supplies, and attaches videos of "managers hoarding the supplies." *Id*. at ¶ 59. Plaintiffs' other alleged internal complaints and reports to the DMC Defendants also related to the environmental services provided by Crothall/Compass and raised concerns of inadequate cleaning supplies, the use of "Brawny" paper towels instead of rags or mops to clean and sanitize, and the general lack of sanitary operating rooms and patient rooms. (ECF No. 50, at ¶¶ 87-95). Plaintiffs also submitted OSHA complaints about the lack of supplies. *Id*. at ¶¶ 99-100. Plaintiffs' OSHA complaint states, in

4

part, that "Crothall has a serious problem with keeping supplies on a regular [sic], we are in a PANDEMIC. . . and I am not able to clean and keep patients, staff and employees safe. Harper Hutzel is the facility with this problem." *Id*. at ¶ 99. Another OSHA complaint submitted by Plaintiffs states: "Harper Hospital is not safe and is a hazard that is operated by Crothall Healthcare . . .. Crothall Healthcare has a serious problem with keeping supplies, rags, mops, trash bags, chemicals, etc. . . . EVS department is to keep the facility clean, safe and [sic] from hazardous at Harper Hospital.  In order to keep a clean and safe facility we need to 8 have supplies on a regular basis.  We are in a PANDEMIC.  At one point the virus (Covid-19) hit the EVS department hard. I'm no expert, but do [sic] to no supplies is a hazardous, unsafe, and unclean facility.  That's a violation . . . and it's time for someone to pay a visit and intervene on behalf of safety at Harper Hospital." *Id*.  Plaintiff Rhodes complained in an email to "Crothall/Compass leadership" regarding "bad sanitary environment," "lack of medical/cleaning supplies," lack of a fit test, "not enough sterilization supplies," and "supplies are always out of stock or rationed." *Id*. at ¶ 131.

Plaintiffs allege that because of these complaints to OSHA, Crothall/Compass were fined and that the "fine upset Defendants and the retaliation and mission to terminate Plaintiffs became Defendants' main focus."

5

*Id*. at ¶¶ 101-02.  After Crothall/Compass terminated Plaintiffs' employment, they brought this action against Crothall/Compass and the DMC Defendants.  In the TAC, Plaintiffs allege eight employment-based claims, including violations of the retaliation provisions of the Michigan FCA and the federal FCA, the Bullard Plawecki Employee Right to Know Act, and the Elliott Larson Civil Rights Act; intentional infliction of emotional distress; conspiracy; wrongful discharge; and a whistleblower claim.  Defendants' motion to dismiss is only related to Counts I and II of the TAC, in which Plaintiffs allege Defendants violated the Michigan FCA and the federal FCA.

**III.    ANALYSIS**

   A.    <u>Standard of Review</u>

In deciding a motion to dismiss under Rule 12(b)(6), the court "must construe the complaint in the light most favorable to the [nonmoving party] … [and] accept all well-pled factual allegations as true*.*" *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545

(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Moreover, the complaint must "contain[ ] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief, such as "when an affirmative defense ... appears on its face." *Jones v. Bock*, 549 U.S. 199, 215 (2007) (quotation marks omitted). A claim has "facial plausibility" when the nonmoving party pleads facts that "allow[ ] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Id*. at 678. However, a claim does not have "facial plausibility" when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679. The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens*, 500 F.3d at 527. Showing entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

7

B.    <u>Count I - Michigan FCA</u>

The DMC Defendants argue that Plaintiffs' Michigan FCA claim against them must fail because the protections of the Michigan FCA only apply to "employees" and the TAC makes it clear that Crothall/Compass employed Plaintiffs. Mich. Comp. Laws § 400.610c prohibits an employer from retaliating against an employee "because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act." Unlike the federal FCA, the Michigan FCA does not extend protection to "contractors." *Compare* Mich. Comp. Laws § 400.610c with 31 U.S.C. § 3730(h). Thus, the DMC Defendants argue that because Plaintiffs were employed by Crothall/Compass and not the DMC Defendants, they cannot bring a Michigan FCA claim against them.

In response, Plaintiffs appear to concede that only employees may sue under the Michigan FCA. Thus, Plaintiffs argue that the DMC Defendants and Crothall/Compass were "joint employers" of Plaintiffs and therefore, they can bring the Michigan FCA claim against the DMC Defendants. However, nothing in the TAC suggests that the DMC Defendants were joint employers with Crothall/Compass. More specifically, Plaintiffs point to no allegations in the TAC

from which the court could draw a reasonable inference that the DMC Defendants were a joint employer with Crothall/Compass. In fact, such an inference is contrary to the multitude of express allegations in the TAC that Plaintiffs were employed by Crothall/Compass. Without any supporting allegations, the court cannot infer a plausible claim that the DMC Defendants were a joint employer, and thus this claim must be dismissed as to the DMC Defendants. *See e.g.*, *Lee v. EUSA Pharma US LLC*, 2023 WL 3212334, at *3 (E.D. Mich. May 2, 2023) (Accepting every factual allegation as true and making all reasonable inferences in favor of the plaintiff, the court could not conclude or infer that the defendant was the plaintiff's joint employer).

Additionally, all Defendants argue that the Michigan FCA, unlike the federal FCA, only protects employees involved in "initiating, assisting in, or participating in the furtherance of an action," or "an investigation" of an action, under the act. *See Mikhaeil v. Walgreens Inc.*, 2015 WL 778179, at *11 (E.D. Mich. Feb. 24, 2015) (The Michigan FCA is more limited than the federal FCA and only protects an employee "who engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act" and does not protect against "other efforts" like the federal FCA) (quoting Mich. Comp.

Laws § 400.610c).  According to Defendants, nothing in the TAC suggests that Plaintiffs initiated, assisted in, or participated in the furtherance of an action under the Michigan FCA or cooperated with or assisted in an investigation under the Michigan FCA.  In response, Plaintiffs argue "that is simply not true based on the allegations asserted in [the TAC] and Exhibit A."  (ECF No. 59, PageID.2033).

The TAC and Exhibit A belie Plaintiffs' arguments.  Exhibit A is documentation of Plaintiffs' complaints about health and safety along with documents relating to a MIOSHA investigation, but nothing in these documents evidence any Michigan FCA investigation or that Plaintiffs assisted in any such investigation.  The same is true of the allegations in the TAC.  Nothing in the TAC even refers to the existence of a Michigan FCA investigation related to Plaintiffs' complaints or that they assisted or participated in any such investigation.  (ECF No. 50).  Accordingly, the TAC fails to plausibly allege a violation of the Michigan FCA retaliation provision and this claim against all Defendants must be dismissed for this reason as well.

    C.    <u>Count II – the Federal FCA</u>

To succeed on a claim against Defendants for violating the retaliation provisions of the federal FCA (31 U.S.C. § 3730(h)), Plaintiffs must show that (1) they engaged in a protected activity, (2) the DMC Defendants knew they engaged

in the protected activity, and (3) the DMC Defendants discharged or otherwise discriminated against the employees because of the protected activity. *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) and *Jones- McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 398 (6th Cir. 2015)). Dismissal of a retaliation claim is proper when a plaintiff fails to adequately plead any one of these three elements. *Id*.

While the DMC Defendants argue that the TAC fails to plausibly allege all three elements, the court need only address the first: protected activity. As explained in *Fakorede*, relevant protected activity would be an "effort[ ] to stop 1 or more violations of [the FCA]." *Id*. (quoting 31 U.S.C. § 3730(h)). Such an effort must stem from a reasonable belief that fraud is being committed against the federal government. *Id*. (citing *Jones-McNamara*, 630 F. App'x at 400). Thus, to sufficiently plead protected activity, a plaintiff "must allege conduct directed at stopping what he reasonably believed to be fraud committed against the *federal* government." *Id*. (citing *Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016)). Plaintiffs argue, in conclusory fashion, that their complaints to OSHA, hospital management, and their employers were all "efforts to stop violations of the FCA." (ECF No. 59, PageID.2036).

11

The facts in *Fakorede* illustrate when allegations insufficiently identify any misconduct that violates the federal FCA or fail to allege that the complaints at issue were aimed at stopping a violation. In *Fakorede*, the background facts are as follows:

> Fakorede was a physician who worked as a cardiologist in Jackson, Tennessee from 2013 to 2015. He was recruited to work in the Jackson area by the Jackson-Madison County General Hospital District—a Tennessee governmental entity—in order to fill a need for cardiologists in the area.
>
> As a result, Fakorede became an employee of Mid-South, a private corporation in Jackson. Under a separate recruiting agreement, the Hospital District agreed to establish a support account that ensured Fakorede was paid $500,000, no matter his total patient collections. Essentially, the Hospital District permitted Fakorede to use the support account to draw the difference between his net collections (total collections value minus any expenses attributed to him) and $500,000. Instead, in accordance with its separate employment agreement, Mid-South simply paid Fakorede $500,000, accounted for his collections, and then directed him to draw on the support account based on those calculations. Fakorede then assigned the draw to Mid-South. Additionally, Mid-South and Fakorede agreed that, if Fakorede did not stay for the full three-year term outlined in the recruiting agreement, he would owe any draw amount back to the Hospital District. However, Mid-South agreed to indemnify Fakorede if the Hospital District determined "based on an accounting" that draws from the support fund had been improperly calculated.

> Approximately ten months into his first year, Fakorede asked for documentation related to Mid-South's calculations of the draw totals. Then, approximately fourteen months after starting work at Mid-South—some four months after he first raised concerns about how expenses had been calculated—Fakorede was terminated. It later came to light that Mid-South had improperly attributed over $200,000 in expenses to Fakorede during his first year. He now brings this retaliation claim under the FCA, 31 U.S.C. § 3730(h), based on his termination.

*Id*. at 788.  In order to tie his conduct to federal fraud and survive a motion to dismiss, Fakorede asserted that, if Mid-South improperly calculated expenses to overdraw from the support account, then any Medicare claims "tainted" by violations of the Stark Law and Anti-Kickback Statute were submitted to Medicare in violation of the FCA.  *Id*. at 789-90.  Essentially, as explained by the Sixth Circuit, Fakorede "requested information related to expenses attributed to him by his private employer, expressed concerns as to whether those expenses were correctly calculated and reimbursed by a Tennessee entity, and reminded others that an audit should check for compliance with federal law."  *Id*. at 790.  The court concluded that this insufficiently alleged conduct reasonably related to fraud against the federal government.  *Id*.

   Similarly here, the allegations the in the TAC fail to show Plaintiffs' complaints were reasonably related to fraud against the federal government.  The

13

TAC contains conclusory allegations that "Defendants violated and falsified Certificates of Participation in order to bill Medicare / Medicaid," (ECF No. 50, ¶ 63), that "the Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants," paid the claims, (ECF No. 50, ¶ 162; *see also* ¶¶ 110-12, 167-68).  The TAC also identifies one complaint where a Plaintiff wrote that "[i]f you take patient's money and bill medicare [sic] and Medicaid for services then the ORs and hospital rooms must be sterile and clean if they knew that the ORs and rooms were filled with disgusting conditions they would never pay." (ECF No. 50, ¶ 131).  These allegations and the single complaint mentioning Medicaid, however, do not specifically identify any alleged misconduct that violates the federal FCA or show that Plaintiffs' complaints were aimed at stopping a federal FCA violation.  Simply stating that Plaintiffs know that the DMC receives Medicare/Medicaid payments does not equate to a federal FCA violation or that Plaintiffs' complaints were reporting one.  *See Ling v. Pharmacy Alternatives, LLC*, 2022 WL 36404, at *4 (D. Kan. Jan. 4, 2022) (Where the only facts alleged regarding the plaintiff's alleged protected activity are that she raised concerns about the defendant having unlicensed and unregistered personnel dispensing prescription medications in the state of Kansas in contravention of Kansas law and that she contacted the Kansas Board of Pharmacy, the plaintiff

14

was concerned about violations of Kansas law, not with trying to stop one or more violations of the FCA; and thus failed to sufficient plead protected activity under the FCA.). Like in *Fakorede*, nothing in the TAC shows that Plaintiffs understood, were motivated by, or were even aware of the federal FCA or the Defendants' billing practices and whether Crothall/Compass' services are even billed to Medicare/Medicaid. *Fakorede*, 709 F. App'x at 790. Accordingly, Plaintiffs have not plausibly alleged protected conduct under the federal FCA and the motion to dismiss this claim must be granted.

## IV. CONCLUSION

For the reasons set forth, the motion to dismiss Counts I and II of the Third Amended Complaint is **GRANTED**.

**SO ORDERED**.

Date: March 27, 2024         s/F. Kay Behm
                             F. Kay Behm
                             United States District Judge